UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

—————————————————————————
                                                )
PUBLIC IMPACT, LLC,                             )
                                                )
          Plaintiff,                            )
                                                )          Civil No.
          v.                                    )          15-13361-FDS
                                                )
BOSTON CONSULTING GROUP, INC.,                  )
                                                )
          Defendant.                            )
—————————————————————————)

MEMORANDUM AND ORDER ON
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

SAYLOR, J.

       This is an action for trademark infringement of the mark "PUBLIC IMPACT."  Plaintiff

Public Impact, LLC is an education policy and management consulting firm based in North

Carolina.  Plaintiff is the owner of the federally registered trademark PUBLIC IMPACT.

Defendant Boston Consulting Group, Inc., is a global management consulting firm based in

Massachusetts.  The Centre for Public Impact ("CPI") is a Swiss not-for-profit foundation

created by BCG in June 2014.  Public Impact has moved for a preliminary injunction against

BCG's use of the PUBLIC IMPACT mark in connection with CPI.

       For the reasons described below, plaintiff's motion will be granted in part and denied in

part.

I.     **Factual Background**

       A.     **Public Impact**

       Public Impact, LLC is an education policy and management consulting firm based in

Carrboro, North Carolina.  (Hassel Decl. ¶¶ 3, 7).  According to Public Impact, its employees are

researchers, policy experts, and consultants who work to improve learning outcomes for K–12 students in the United States.  (Hassel Decl. ¶¶ 12,13).  Public Impact's clients include private foundations, government agencies, school districts, charter systems, nonprofit organizations, and education leaders nationwide.  (Hassel Decl. ¶¶ 7, 14-15).

Public Impact is the owner of a federally registered mark, PUBLIC IMPACT, U.S. Reg. No. 2805013 (the "mark"), which it uses in connection with its consulting services in the field of education.  (Hassel Decl. ¶ 8, Ex. A).  Public Impact registered the PUBLIC IMPACT mark in 2004.  In 2009, the United States Patent and Trademark Office issued a notice confirming that the mark is incontestable.  (Hassel Decl. ¶ 10, Ex. C).

Although it is a small company, Public Impact contends that it is well-known in the education field.  Co-founder Bryan Hassel has served on the President's Commission on Excellence in Special Education.  (Hassel Decl. ¶ 20).  In addition, the Department of Education chose Public Impact to lead its initiative assisting states winning "Race to the Top" grants for school turnaround efforts and to author a report on the national vision for the future of charter schools.  (Hassel Decl. ¶¶ 21, 24).  Public Impact has also received unsolicited press coverage at least 39 times in the last four years.  (Hassel Decl. ¶ 25, Ex. F).

Public Impact contends that it has used the PUBLIC IMPACT mark in performing all of those projects.  It also contends that it has sought to enhance the public profile of its mark through a "thought leadership" strategy, which is a business development model built around consultants who "create informative websites, host persuasive seminars, book speaking engagements and get published as a columnist and eventually as author of a book."  Henry Devries, *How Consultants Can Market Like a Thought Leader*, FORBES, available at *http://www.forbes.com/sites/henrydevries/2013/10/25/how-consultants-can-market-like-a-*

*thought-leader/.*  In carrying out its strategy, Public Impact has sponsored conferences and published reports and its representatives have spoken at public forums.

Public Impact also uses the mark on three websites (PublicImpact.com, OpportunityCulture.org, and SchoolTurnarounds.org) and in marketing its services on social media websites such as Facebook (facebook.com/publicimpact) and Twitter (twitter.com/publicimpact).  (Hassel Decl. ¶¶ 28, 29, Ex. G).  Finally, Public Impact contends that it has used the mark in connection with hundreds of thousands of dollars spent marketing its services.  (Hassel Decl. ¶ 16).

> **B.**      **Boston Consulting Group**

Boston Consulting Group, Inc., is a global management-consulting firm based in Boston, Massachusetts, with 82 offices in 46 countries.  (Pitman Decl. ¶¶ 3-4).  BCG works with clients from the private, public, and not-for-profit sectors.  (Pitman Decl. ¶ 4).

BCG maintains an "Education" group focused on "tackling the key drivers of improvement in education."  (DeAntonio Decl. Ex. E).  The group "covers all major educational topics and works with every type of educational organization."  (DeAntonio Decl. Ex. E).  BCG's Education group clients include school districts, charter systems, and government agencies.  (DeAntonio Decl. Ex. F).

> **C.**      **The Centre for Public Impact:  A BCG Foundation**

The Centre for Public Impact is a Swiss not-for-profit foundation created by BCG in June 2014.  Its stated mission is to improve the efficiency and effectiveness of governments' delivery of public services to their citizens.   In addition to the field of education, CPI's work addresses government provision of other public services, such as electricity, healthcare, transportation, housing, and waste and water-supply management.  (Pitman Decl. ¶¶ 5, 9-10).

BCG owns several trademark registrations for the mark THE CENTRE FOR PUBLIC IMPACT:  A BCG FOUNDATION (the "CPI mark"), including registrations in the United Kingdom, Australia, and Switzerland.  (Pitman Decl. ¶ 7).  It has another application for the mark pending in Canada.  (*Id.*).  BCG has not sought trademark registration for the CPI mark in the United States.  CPI uses its mark for "organizing, arranging, and conducting seminars, tutorials, lectures, exhibitions, and conferences including concerning issues in the fields of governance, bureaucratic administration, general welfare, and societal advancement."  (*Id.*).

CPI maintains a website (centreforpublicimpact.org) on which it advertises CPI events.  It also advertises through word of mouth and news coverage.  (Pitman Decl. ¶¶ 8,9).  CPI also maintains a Twitter account under the username "@4PublicImpact," and uses the hashtag "#publicimpact."  (Hassel Decl. Ex. V).  CPI uses Twitter to promote articles and events, and has posted tweets on education policy.  (Hassel Decl. Ex. Q, V).

## II.     Procedural History

On June 9, 2015, Public Impact filed a motion for injunctive relief in federal court in North Carolina.  *Public Impact, LLC v. Boston Consulting Group, Inc.*, Case No. 1:15-cv-464 (M.D.N.C. 2015).  On August 4, 2015, that case was dismissed for lack of personal jurisdiction and Public Impact's motion for injunctive relief was denied as moot.  On September 15, 2015, Public Impact refiled its lawsuit and motion in this Court.

## III.    Analysis

To obtain a preliminary injunction in a trademark case, a party must show (1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm, (3) that the balance of equities is in its favor, and (4) that the granting of the injunction will not adversely affect the public interest.  *See TEC Eng'g Corp. v. Budget Molders Supply, Inc.*, 82 F.3d 542,

544 (1st Cir. 1996).

**A.      Likelihood of Success on the Merits**

A plaintiff seeking to establish claims for infringement and unfair competition under the

Lanham Act must show "both that its mark merits protection and that the allegedly infringing use

is likely to result in consumer confusion." *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443

F.3d 112, 116 (1st Cir. 2006).  Under Massachusetts law, "[t]he gravamen" of an infringement

claim "is the same as under the Lanham Act:  likelihood of confusion." *Jenzabar, Inc. v. Long*

*Bow Group, Inc.*, 82 Mass. App. Ct. 648, 654 n.11 (2012).

Plaintiff advances both an ordinary confusion claim and a "reverse confusion" claim.  An

ordinary confusion claim is one in which an established senior user asserts that a smaller junior

user is diverting the senior user's customers and free-riding on the senior user's pre-existing

reputation and goodwill.  Reverse confusion occurs when a large or well-established junior user

enters a new market and threatens to overwhelm a smaller senior user.  *See generally Attrezzi,*

*LLC v. Maytag Corp.*, 436 F.3d 32 (1st Cir. 2006).  In a reverse confusion case, injury can result

either because (1) current or prospective customers of the senior user associate the senior user's

services with services offered by the junior user, or (2) because the junior user's use of the mark

"saturates and the market and overwhelms the senior user" such that "the senior user loses the

value of the trademark, its product identity, corporate identity, control over its goodwill and

reputation, and ability to move into new markets."  *Id.* at 39 (quoting *Ameritech, Inc. v. AM Info.*

*Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)).

As the Third Circuit has noted, the doctrine of "reverse confusion" should be applied

with some care.  *See A & H Sportswear, Inc. v. Victoria's Secret Stores*, 237 F.3d 198, 228 (3d

Cir. 2000).  The court there observed that "the chief danger inherent in recognizing reverse

confusion claims is that innovative junior users, who have invested heavily in promoting a particular mark, will suddenly find their use of the mark blocked by plaintiffs who have not invested in, or promoted, their own marks.  Further, an overly-vigorous use of the doctrine of reverse confusion could potentially inhibit larger companies with established marks from expanding their product lines . . . ."  *Id.* (citation omitted).  Furthermore, "selection of a mark with a [relatively common name] naturally entails a risk of some uncertainty and the law will not assure absolute protection."  *Id.* at 227.  The doctrine, nonetheless, protects important interests that are relevant here.  *Id.* ("[W]ithout the existence of such a claim, smaller business owners might not have any incentive to invest in their marks at all, for fear the mark could be usurped at will by a larger competitor.").

### 1.    The Protectability of Public Impact's Trademark

In 2009, the USPTO issued a notice confirming that the mark PUBLIC IMPACT was incontestable.  (Hassel Decl. Ex. C).  Ordinarily, incontestability is "conclusive evidence of the validity of the registered mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce."  15 U.S.C. § 1115(b); *see also Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 220 (1st Cir. 1989) (holder of an incontestable mark "may rely on incontestability to enjoin infringement").

Incontestable marks, however, are subject to the defense that the mark is generic.  *See* 15 U.S.C. § 1115(b); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 195 (1985) ("An incontestable mark that becomes generic may be canceled at any time" under 15 U.S.C. § 1064).[1]  "A generic term is one that does not distinguish the goods of one producer from the

---

[1] Marks are divided into five categories based on an increasing level of distinctiveness:  (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful.  *Colt Def. LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).

goods of others.  Instead, it is one that either by definition or through common use has come to be understood as referring to the genus of which the particular product is a species." *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373-74 (1st Cir. 1980) (internal quotations omitted).

Registration of a mark establishes a rebuttable presumption that the term is not generic. 15 U.S.C. § 1115(a); *Colt Defense LLC v. Bushmaster Firearms, Inc.*, 486 F.3d 701, 705 (1st Cir. 2007).  In order to overcome the presumption, the alleged infringer must demonstrate the mark's genericness by a preponderance of the evidence.  *Colt*, 486 F.3d at 705.  The determination of whether a mark is generic relies on a two-part inquiry.  First, the genus of the goods or services at issue must be identified.  Second, the court must determine whether the mark at issue is understood by the relevant public to refer primarily to that genus of goods or services.  *H. Marvin Ginn Corp. v. International Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 990 (Fed. Cir. 1986).

Plaintiff contends that it uses the PUBLIC IMPACT mark for its education-related research and consulting services.  BCG appears to agree in substance, noting at oral argument that plaintiff registered and uses the mark "in connection with public policy consulting."  (Tr. 26:14).  Thus, for the purposes of this analysis, the Court assumes that the relevant genus of services is "consulting services."

As evidence of the public's understanding of the mark, BCG has provided a list of 27 third-party uses of the words "public impact."  That list, however, falls well short of meeting BCG's burden to show that the relevant public understands the term to refer primarily to consulting services.  To start, two of the BCG's examples are organizations located outside of the United States.[2]  Furthermore, many of the organizations cited by BCG use only the words

---

[2] These are Public Impact Management, a French public-sector consulting firm, and Public Impact, a UK-based public relations firm.

"Public" or "Impact," and do not use the entire phrase or mark PUBLIC IMPACT, thus providing only weak evidence that the mark is generic. *See Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 18 (1st Cir. 2008) (citing *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1150 (9th Cir. 1999) (finding that the analysis of whether the mark is generic should be conducted by looking at an entire mark rather than dissecting it into its smaller parts)).[3]

Third, it appears that many of the example usages of the phrase "public impact" do not use it to refer "consulting services," which is the relevant genus for the inquiry. For example, BCG points to the University of Oregon's Public Impact Graduate Fellowship program, which provides a fellowship award to graduate students "whose research has the potential to have a significant impact on society." (Stewart Decl. ¶ 4, Ex. B).

BCG has also submitted extensive evidence of media usage of the phrase "public impact."[4] "It is well-established that '[a] word may be generic of some things and not of others.'" *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 147 (2d Cir. 1997) (quoting *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980)); *Expoconsul Int'l, Inc. v. A/E Sys., Inc.*, 755 F. Supp. 1237, 1243 (S.D.N.Y. 1991) ("[I]n various cases a word [has been] found to be generic in one application but not in another."). BCG itself contends that CPI uses the term "public impact" on its website in a generic sense to refer to the "effect of initiatives aimed at the general public, including in connection with education." (Def.'s Opp. 6). That is the same way

---

[3] These examples include "Impact, Inc.," "Public Consulting Group," and "Impact Management Group," among others.

[4] As evidence of media usage, BCG submitted a 584-page, non-searchable pdf file that appears to be the results of a LexisNexis search for all articles that include both the phrase "public impact" and either "education," "government," or "consulting." (Stewart Decl. Ex. AD). Many of the pages do not include any of those words, and the Court has been unable to find any examples that would support BCG's contention that plaintiff's mark is generic.

in which most, if not all, of the media references submitted by BCG use the phrase.  When used in this manner, the words "public impact" refer to the actual "effect" of policy initiatives, and not to the process of designing or planning those initiatives, which might fall within the genus of consulting services for which plaintiff's mark is used.  Put another way, plaintiff uses the mark in connection with selling the *service* of planning or designing policy initiatives meant to have an effect on the public, whereas the examples submitted by BCG appear to use the words to refer to the hoped-for *result* of those services.

At least at this stage of the litigation, BCG's evidence is insufficient to overcome the presumption that plaintiff's registered, incontestable mark is not generic.  Therefore, plaintiff is likely to succeed in establishing that it owns a valid mark that is entitled to protection.

### 2.     Likelihood of Confusion

The key element in any infringement action is likelihood of confusion.  *Calamari Fisheries, Inc. v. The Village Catch, Inc.*, 698 F. Supp. 994, 1009 (D. Mass. 1988).  To determine whether there is a likelihood of consumer confusion of two competing marks, the Court must consider at least the following factors:

> (1) the similarity of the marks; (2) the similarity of . . . the [parties'] services; (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark.

*Attrezzi*, 436 F.3d at 39.

### (a)     Similarity of Marks

When determining the similarity of two marks, a court should consider the "sight, sound and meaning" of the marks.  *Boustany v. Boston Dental Grp., Inc.*, 42 F. Supp. 2d 100, 108 (D. Mass. 1999).  In the end, the determination of whether the marks are similar should be based on

"the total effect of the designation, rather than a comparison of individual features."  *Id.*

"[Marks] are to be compared as ordinary purchasers . . . would compare them, that is, on the

basis of similarities in their general appearance both in construction and in over-all impression

on the eye."  *Coca-Cola Co. v. Snow Crest Beverages, Inc.*, 162 F.2d 280, 284 (1st Cir. 1947).

When evaluating marks containing words, the type of letters used (script or block), the color and

composition of the background upon which they appear, and the spelling of the words, are all

important considerations.  *Id.* at 283-84.  "Where the goods and services are directly competitive,

the degree of similarity required to prove a likelihood of confusion is less than in the case of

dissimilar products."  4 McCarthy on Trademarks and Unfair Competition § 23:20.50 (4th

ed.).

　　　　In substance, plaintiff has identified two sets of uses of the PUBLIC IMPACT mark by

BCG and CPI that it considers infringing:  BCG's use of the words "public impact" in CPI's

name and BCG's use of those words on the social media website Twitter.  The Court will

consider each separately.

### (i)　　　　The Centre for Public Impact:  A BCG Foundation

　　　　Plaintiff's primary focus is on the use of the mark, "THE CENTRE FOR PUBLIC

IMPACT:  A BCG FOUNDATION."  Plaintiff contends that the mark is similar to its own mark

because the dominant feature of both marks is the words "PUBLIC IMPACT."   Plaintiff further

contends that the addition of the house mark "A BCG FOUNDATION" makes it even more

likely that consumers will be confused.

　　　　BCG offers four arguments in response.  First, BCG notes that the eight-word CPI mark

is much longer than plaintiff's mark.  Second, BCG argues that consumers are more likely to

focus on the differences between the two marks because "PUBLIC IMPACT" is a weak mark.

Third, BCG directly disputes the effect of its house mark, which it asserts makes confusion less likely.  Fourth, BCG highlights the visual differences in the way the respective marks are used in logo form.

The words "public impact" do form the dominant feature of CPI's mark, strengthening the similarity between the marks.  *See Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*, 376 F.3d 8, 18 (1st Cir. 2004).  However, their dominance in the CPI mark is diluted by the lead-in words "Centre for"; furthermore, the word "Centre" draws even more attention, not only because it appears first in the mark, but because its spelling is the British or Canadian form, not the form normally used in the United States, where plaintiff's mark is protected.

The parties also dispute the effect of the presence of "A BCG Foundation" in the CPI mark.  As an initial matter, the materiality of the house mark may be overstated, as plaintiff's exhibits often show use of the words "Centre for Public Impact" without the house mark appended.  Regardless, because plaintiff alleges harm from reverse confusion, the linkage could actually aggravate the threat to plaintiff's mark to the extent that BCG is the more recognized name in consulting.  *See Attrezzi*, 436 F.3d at 39.  Of course, the opposite is also true—to the extent that plaintiff alleges ordinary confusion, the addition of the house mark would decrease the likelihood of confusion.  *See id.*

In logo form, the two marks bear little similarity to each other outside of the common usage of the words "Public Impact."  Plaintiff uses a logo consisting of the words "PUBLIC IMPACT" displayed in a bold font, uniform in color, shown in small and large caps, enclosed by a slightly rounded rectangle, also of the same uniform color.  Centered below the rectangle are seven side-by-side childlike cartoon figures in various colors, with a horizontal line extending out from either side of the figures:



(Stewart Decl. Ex. AF).

CPI's logo, in contrast, consists of the words "Centre for" placed over the words "Public Impact."  All four words are shown in initial caps, in the same font; underneath is placed a house mark, "A BCG FOUNDATION," in much smaller font in all caps.  All three lines of text are left-justified.  When used in the logo, the words "Public Impact" are bolded or otherwise shown in a way such that the "Public Impact" portion of the logo stands out from the rest of the mark.  Finally, a broken green square is placed to the upper-left of the word "Centre":



(Stewart Decl. Ex. AG).

As discussed below, plaintiff offers educational consulting services to relatively sophisticated consumers.  Those consumers are likely to be exposed to the logo marks of each organization in the course of deciding whether to purchase such services.  *See Snow Crest Beverages*, 162 F.2d at 284 ("[Marks] are to be compared as ordinary purchasers . . . would compare them.").

Ultimately, the similarity of two marks must be based on "the total effect of the designation, rather than a comparison of individual features."  *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981).  In written and spoken form, the

CPI mark is similar, though not identical, to plaintiff's "PUBLIC IMPACT" mark.  However, when the logo forms of the marks are included, the similarity between the two decreases substantially.  On the whole, the Court finds that CPI's mark is somewhat similar to plaintiff's mark, but there are discernible differences, particularly to sophisticated clients or customers.

### (ii)      @4PublicImpact and #publicimpact

Plaintiff next contends that BCG, through CPI, infringes its mark on the social media website Twitter by using "@4PublicImpact" as its username and the hashtag "#publicimpact" in its posts.  CPI's username, "@4publicimpact," automatically attaches to every posting made on CPI's Twitter account, and, by definition, serves to identify the source of the post.  The inclusion of the number "4" directly preceding the words "public impact" does not prevent the use from being virtually identical to plaintiff's PUBLIC IMPACT mark.  Thus, unlike CPI's full mark, its use of "@4publicimpact" is highly similar to plaintiff's mark.

Where CPI's Twitter username is merely *almost* identical to plaintiff's mark, CPI's use of the hashtag "#publicimpact" *is* identical to the mark.  Although CPI contends it does not use the hashtag #publicimpact as a mark, a review of the materials submitted reveals that plaintiff has a substantial likelihood of success in proving otherwise.[5]

### (b)      Similarity of Services

The parties offer essentially identical services—that is, consulting services.  *See Calamari Fisheries*, 698 F. Supp. at 1010.  BCG contends that there is no overlap in services provided because CPI itself (as opposed to BCG) does in fact not provide any consulting services and because BCG does not use CPI to promote its own consulting services.  For the reasons discussed below, plaintiff is likely to succeed in showing that BCG does in fact use CPI to

---

[5] Although the record contains scant evidence of how CPI's logo is used in conjunction with the various forms of "publicimpact" on social media, it bears noting that it is likely that, at a minimum, the logo is less prominently displayed than in contexts where CPI uses the full version of its formal name.

promote BCG itself.  This factor weighs in favor of a likelihood of confusion.

> **(c)** **Relationship between the Parties' Channels of Trade, Juxtaposition of Advertising, and Classes of Prospective Purchasers**

The relationship between the parties' channels of trade, the relationship between their advertising, and the classes of their prospective purchasers are normally considered together. *See Pignons*, 657 F.2d at 488; *Copy Cop, Inc. v. Task Printing, Inc.*, 908 F. Supp. 37, 45 (D. Mass. 1995).  The parties do not dispute that they both provide consulting services in the United States in the field of education.  Plaintiff has also submitted some evidence demonstrating that both it and BCG serve similar (and, in at least one case, identical) clients.  (Hassel Decl. ¶¶ 14, 43, Ex. D; DeAntonio Decl. Exs. F, G).

BCG contends that the parties' channels of trade are different because plaintiff provides consulting services, whereas CPI "hosts events and forums and convenes roundtables about matters of public impact with groups and government officials."  (Def.'s Opp. 13).  BCG further contends that the parties' methods of advertising are different because CPI does not advertise and BCG does not use CPI as a marketing tool.  (Brown Decl. ¶ 9).

BCG's statement that "CPI is not a marketing tool" asks the Court to ignore the obvious. Even a quick review reveals that the CPI website features numerous articles written by BCG consultants, with links to those consultants' biographies on BCG's own website.  (*See, e.g.*, Anderson Decl. Ex. A).[6]  CPI also uses social media to announce and promote articles written by BCG consultants.  (Second DeAntonio Decl. Ex. D, at 3).  The argument that CPI is *not* being used to market BCG is further undercut by BCG's argument elsewhere that attachment of its

---

[6] This declaration and its exhibits were the subject of a motion for "leave to file subsequently published evidence" filed by plaintiff after the Court's deadline for submitting supplemental materials following oral argument.  (*See* Dkt. 44).  The Court will grant plaintiff's motion because the materials are relevant, and because their submission does not unfairly prejudice BCG, which had an opportunity to respond to the materials (and did so).

house mark to the CPI mark reduces consumer confusion precisely *because* it reinforces CPI's relationship as a BCG entity.  Finally, BCG's representations are in direct contradiction to the views held by its own CEO, Rich Lesser, who has stated that CPI "help[s] us continue to win" in the consulting environment.  (Second DeAntonio Decl. Ex. A, at 4).

Plaintiff contends that both it and BCG (through CPI) utilize the "thought leadership" model for business development.  "Thought leadership," according to plaintiff, refers to the process of establishing oneself as a "thought leader" or subject-matter expert in an particular field through publishing articles and reports, speaking at public forums, sponsoring conferences and symposiums, fostering relevant professional networks, and generally becoming known in the industry as an expert.  In addition, plaintiff has submitted evidence that both it and CPI promote themselves on websites, Twitter, and other social media.

Although plaintiff is a smaller firm providing consulting services only in the United States and only in the field of education, it competes with BCG in the field where the two entities overlap.  The parties thus operate in essentially identical channels of trade, both advertise using similar media and methods, and both have the same classes of prospective purchasers.  Those factors all weigh in favor of the plaintiff.

### (d)  Evidence of Actual Confusion

Actual confusion "is often taken to be the most persuasive possible evidence that there is a likelihood of confusion.  Actual confusion is such persuasive evidence that even a minimal demonstration of actual confusion may be significant."  *Boustany*, 42 F. Supp. 2d at 110 (quoting *Copy Cop*, 908 F. Supp. at 45).

However, "proof of actual confusion is not essential to finding likelihood of confusion." *Borinquen Biscuit*, 443 F.3d at 120.  The absence of evidence of actual confusion is most

significant when the products have "coexisted on the market for a long period of time." *Id.* at

121 (finding that market coexistence lasting one year from the junior user's product proliferation

was not long enough to require evidence of actual confusion); *Pignons*, 657 F.2d at 490

(explaining that market coexistence without actual confusion for "a substantial period of time"

creates a strong presumption that there is little likelihood of confusion).  The parties disagree as

to the precise "launch date" for CPI.[7]  Determining an exact date, however, is unnecessary, as

CPI is a relatively new entity under either party's view of the facts.  Nonetheless, the absence of

actual confusion may weigh to some degree in BCG's favor and against an injunction.

### (e)     Defendant's Intent in Adopting Mark

Plaintiff contends that BCG adopted its marks in bad faith because it had actual and

constructive notice of plaintiff's mark well before choosing to pursue the CPI marks.  In

evaluating intent, however, courts must distinguish between "a company's knowing decision to

risk a law suit and a factual inference that customer confusion is likely."  *Attrezzi*, 436 F.3d at 40.

"[M]ere knowledge of the existence of a competitor's mark is insufficient to prove bad faith."

*NEC Elecs., Inc. v. New England Circuit Sales, Inc.*, 722 F. Supp. 861, 866 (D. Mass. 1989).

"Bad faith requires proof that one party intended to capitalize on the holder's reputation/goodwill

and confusion between the marks."  *Unleashed Doggie Day Care, LLC v. Petco Animal Supplies

Stores, Inc.*, 828 F. Supp. 2d 384, 395 (D. Mass. 2010).  The parties' submissions adequately

support plaintiff's position that BCG was aware of plaintiff's existence in the industry.  But the

filings do not support an inference that BCG or CPI designed the marks to derive benefit from

plaintiff's goodwill.  Given the global nature of CPI's focus and the relatively small size and

commercial scope of plaintiff's expertise, there is far from sufficient evidence to show that this

---

[7] Plaintiff contends that BCG launched CPI in June 2015.  BCG argues that CPI became "live" no later than October 2014.  (Def.'s Opp. at 13).

was a "copycat" situation.  Although finding bad faith would have favored finding a likelihood of confusion, a lack of bad faith, or even good faith, does not disfavor finding a likelihood-of-confusion.  *Star Fin. Servs., Inc. v. AASTAR Mortg. Corp.*, 89 F.3d 5, 11-12 (1st Cir. 1996).  Thus, this factor is neutral to the likelihood of confusion analysis.

### (f)       Strength of Public Impact's Mark

"Under the Lanham Act strong marks enjoy the greatest protection against infringement." *International Ass'n of Machinists and Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 206 (1st Cir. 1996) (finding service mark "robust" because it had been registered and widely promoted for more than thirty years).  Suggestive marks are generally considered relatively strong marks.  *Calamari Fisheries*, 698 F. Supp. at 1013.  In the First Circuit, however, courts analyze the strength of a mark by focusing on its commercial strength instead of its theoretical classification.  *See Attrezzi*, 436 F.3d at 41.  Several factors may be relevant to ascertaining the commercial strength of a trademark, including "the length of time the mark has been used, the trademark holder's renown in the industry, the potency of the mark in the product field (as measured by the number of similar registered marks), and the trademark holder's efforts to promote and protect the mark."  See *Borinquen Biscuit*, 443 F.3d at 121 (citing *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 32 (1st Cir. 1989)).

Plaintiff contends that its PUBLIC IMPACT mark is strong because it is incontestably distinctive and because it has been consistently used in commerce for almost twenty years.  Plaintiff submits that the amount of its revenue, its unsolicited press coverage, its active social media and e-mail presence, and its "high-profile" national researching and consulting work further confirm the strength of its mark.  Although the evidence is relevant, its weight is reduced by the lack of any evidence sufficient to make a comparison to other consulting firms.  On

balance, however, the mark does appear to have moderate commercial strength.

BCG contends that despite plaintiff's use and promotion of its mark, its strength is overpowered by the list of 27 third-party uses BCG argues demonstrates the genericness of the PUBLIC IMPACT mark. These uses, in defendant's view, demonstrate that the field is crowded such that consumers are accustomed to distinguishing between marks containing the terms "public," "impact," or "public impact."

Plaintiff agrees that third-party use of similar marks on similar goods can demonstrate that a mark is weak, but argues that it is only the commercial use of similar marks for similar services that weakens the commercial strength of a mark. As before, plaintiff maintains that the third-party uses do not diminish the strength of its mark because those uses are either dissimilar from its own mark, do not compete with plaintiff in commerce, or are otherwise sufficiently distinguishable.

For the most part, the third-party uses to which BCG refers are of limited value in assessing the strength of the PUBLIC IMPACT mark. As noted, many of the uses include only one of the words "PUBLIC" or "IMPACT," and most do not use the words consecutively, as they are in plaintiff's mark.[8] Second, a number of the uses are by public relations firms, which—though possibly part of the consulting industry—are distinct from the education consulting field in which BCG and plaintiff compete. *See Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc.*, 288 F. Supp. 2d 105, 125 (D.N.H. 2003) (third-party registrations for unrelated products do not diminish the strength of an otherwise strong mark); *Best Flavors, Inc. v. Mystic River Brewing Co.*, 886 F. Supp. 908, 914 (D. Me. 1995) (distinguishing alcoholic beverages

---

[8] These examples include IMPACT, Inc.; IMPACT Marketing & Public Relations; IMPACT Management Group; IMPACT Consulting Enterprises, LLC; IMPACT Consulting; IMPACT NJ; IMPACT; Governmental IMPACT; IMPACT Publications; IMPACT Communications; Policy IMPACT Communications; PUBLIC Consulting Group; and Collective IMPACT Forum.

from nonalcoholic beverages for likelihood of confusion analysis).[9]  Third, several of the entities that do use the complete phrase "PUBLIC IMPACT" are universities or non-profit organizations that do not appear to be using the mark in any commercial sense.[10]  Marks that were never used to identify products sold in commerce normally have diminished relevance for these purposes. Finally, third-party uses that are limited to international markets where plaintiff's services are not offered or marketed are only marginally relevant to defendant's theory that the relevant purchaser class is conditioned to distinguish between the two marks.[11]

BCG's cited uses, however, do weigh against the strength of plaintiff's mark because they indicate some level of diminished potency and failure to protect the mark, especially as it is used by public relations firms who arguably compete to some degree in the consulting field.  *See Sun Banks of Fla. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316, 317 n.10 (5th Cir. 1981) (finding existing use of the term "sun" in eight financial institutions in Florida weighed against finding strength in plaintiff's mark).  The evidence of third-party use is not, however, sufficient to counteract the evidence that the PUBLIC IMPACT mark has some strength in the field of education policy and research.  In short, the Court finds that in addition to its incontestable distinctiveness, plaintiff's mark has moderate commercial strength despite some third-party uses.

### (g)    <u>Sophistication of the Purchaser Class</u>

The likelihood of confusion may be substantially reduced when the relevant buyer class is composed of sophisticated professional or commercial purchasers of goods and services.

---

[9] For example, PUBLIC IMPACT Public Relations and Fresh IMPACT PUBLIC Relations Group.

[10] For example, the PUBLIC IMPACT Fellowships program of the University of California, Irvine; the PUBLIC IMPACT Fellowships program of the University of Oregon; the PUBLIC IMPACT Grant of the University of Georgia's Willson Center; the PUBLIC IMPACT Symposia of the Southern Methodist University; the PUBLIC IMPACT Engaging Scholarship of the University of Kansas; the PUBLIC IMPACT Research Award of the University of Vermont; and the PUBLIC IMPACT Panel of the Reeve Foundation.

[11] For example, PUBLIC Impact Management (a French public-sector consulting firm) and PUBLIC IMPACT (a UK-based public relations firm).

*CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 888 F. Supp. 192 (D. Me. 1995), *order aff'd*, 97 F.3d 1504 (1st Cir. 1996) (informed professional buyers "are less likely to be confused as to the source or origin of a product than ordinary consumers."); *Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201 (1st Cir. 1983).

The relevant "buyer" class here includes the "private foundations, government agencies, school districts, charter systems, nonprofits, and education policy leaders nationwide" that plaintiff contends pay for its services, either directly or by funding its research work.  (Hassel Decl. ¶¶ 41-43).  Although plaintiff contends that it has several smaller, less-sophisticated clients, these clients—like the buyer class as a whole—are still likely to have considerable skill or experience in discerning between providers of the type of education-related consulting services that plaintiff offers.  In addition, regardless of the size of the prospective client, the decision to engage the services of a consulting firm is hardly likely to be an "impulse buy."  It is difficult to imagine that any person or entity would engage the services of either party without some substantial degree of thought and research.  The relative sophistication of plaintiff's clients thus weighs heavily against finding a likelihood of confusion in this case.

### 3.   Conclusions

#### (a)   Centre for Public Impact: A BCG Foundation

With respect to CPI's use of CENTRE FOR PUBLIC IMPACT and CENTRE FOR PUBLIC IMPACT:  A BCG FOUNDATION, the factors indicating a possible likelihood of confusion with plaintiff's mark are mixed, at best.  In plaintiff's favor, its own mark, PUBLIC IMPACT, appears to have some strength in the relevant commercial market for education-related policy consulting.  Furthermore, BCG uses the same words as plaintiff's mark, verbatim, in CENTRE FOR PUBLIC IMPACT and CENTRE FOR PUBLIC IMPACT:  A BCG

FOUNDATION, creating some similarity among the marks.  BCG also uses those marks in similar channels of trade in marketing consulting services in the field of education policy. However, at least where BCG uses the words "public impact" in the name "Centre for Public Impact:  A BCG Foundation," the addition of "CENTRE FOR" and "A BCG FOUNDATION" is enough to distinguish the marks from PUBLIC IMPACT standing alone, thus lessening the similarity between plaintiff's mark and the CPI marks.  In addition, that similarity decreases substantially when the marks are viewed in logo form, as they most likely would be by prospective purchasers.  Finally—and perhaps most importantly—the relatively high sophistication of the purchaser class and the nature of the purchasing decision makes it unlikely that the two marks will be confused.  Thus, although plaintiff owns a protectable mark, the Court cannot conclude that plaintiff has a substantial likelihood of success on the merits on its claim as to any use of the term "PUBLIC IMPACT" by BCG—in particular, insofar as it is used in the forms CENTRE FOR PUBLIC IMPACT, CENTRE FOR PUBLIC IMPACT:  A BCG FOUNDATION, or the acronym "CPI."

**(b)**      **@4PublicImpact and #publicimpact**

In contrast, BCG's use of words "public impact," standing alone or virtually alone, is much more problematic.  Because BCG competes with plaintiff in offering similar education-related consulting services, its use of the same two words that constitute plaintiff's mark as a source-identifier would be concerning in any context where the words are used without other distinguishing features.

The evidence in the record establishes two such uses, both occurring on the social media website Twitter.  CPI uses "@4PublicImpact"as its Twitter username, and CPI also frequently uses the hashtag "#publicimpact."  Despite the relatively minor addition of the number "4" in the

username "@4PublicImpact," the fact remains that CPI's use of the phrase "public impact" in its Twitter activities is nearly identical to plaintiff's mark. Furthermore, because BCG and plaintiff are competitors, it is likely that even a sophisticated consumer could be confused. *See McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979) ("[W]here the products are identical and the marks are identical, the sophistication of buyers cannot be relied upon to prevent confusion."). Thus, the similarity between the Twitter uses and plaintiff's mark both shifts the similarity factor in favor of plaintiff while simultaneously lessening the chances that even a sophisticated consumer would be able to avoid confusion.

Therefore, the Court finds that plaintiff is likely to succeed on its claim that BCG's use of the phrase "public impact," standing alone or virtually alone, without the accompanying terms "Centre for" or "A BCG Foundation," or without any other modifying information, such as a logo, creates a likelihood of confusion. Specifically, plaintiff is likely to succeed on its claims concerning BCG's use of the phrases "@4PublicImpact" and "#publicimpact."

### B.      Irreparable Harm

In the context of trademark litigation, the First Circuit has generally presumed irreparable harm if a plaintiff demonstrates a likelihood of success on the merits. *See American Bd. of Psychiatry & Neurology, Inc. v. Johnson-Powell*, 129 F.3d 1, 3 (1st Cir. 1997) (citing *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992)). However, whether the presumption still applies is an open question following the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006). *See Swarovski Aktiengesellschaft v. Building No. 19, Inc.*, 704 F.3d 44, 53 (1st Cir. 2013) (discussing without deciding whether the presumption survives after *eBay*). Regardless, plaintiff has submitted evidence demonstrating that the number of CPI's Twitter followers has increased significantly in recent months and that

use of the hashtag #publicimpact is spreading.  (DeAntonio Decl. Ex. V, FF).

As noted, plaintiff has established a substantial likelihood of success on the merits with respect to BCG's use of #publicimpact and @4PublicImpact.  Plaintiff has also submitted social media evidence that the risk of harm to its business, mark, and reputation is growing quickly. Considered together, the Court finds that plaintiff is at risk of continuing and irreparable harm to its protectable trademark interests by that usage.

### C.     The Balance of Harms

In weighing the balance of harms resulting from the granting or denial of a preliminary injunction, it is generally true that the "harm to the defendant flowing from an injunction where infringement appears likely is entitled to less consideration than other harms.  The Court is to consider the potential legitimate harm to the defendants owing to the injunction as balanced against the degree of plaintiff's likelihood of success on the merits."  *Fritz v. Arthur D. Little, Inc.*, 944 F. Supp. 95, 97-98 (D. Mass. 1996).  Here, the Court finds that the possibility of harm to the plaintiff, in light of its showing of a likelihood of success at trial, has not been outweighed by any possible harm to the defendants arising from its inability to use @4PublicImpact or #publicimpact.  Thus, the Court holds that the balance of harm weighs in plaintiff's favor.

### D.     The Public Interest

In trademark cases, the public interest almost always favors the granting of otherwise "appropriate injunctions."  *Fritz*, 944 F. Supp. at 97 (citing *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 612 (1st Cir. 1988)).  With respect to the uses @4PublicImpact and #publicimpact, plaintiff has demonstrated a likelihood of consumer confusion, and that showing "is enough to place the weight of public interest concerns in favor of granting the injunction."  *Boustany*, 42 F. Supp. 2d at 113.

###### E. Geographic Scope of Injunction

A party's protectable trade area is specifically "delimit[ed] . . . by examining the party's reputation, advertising, and sales with respect to the territory in question." *Thrifty Rent-A-Car Sys., Inc. v. Thrift Cars, Inc.*, 639 F. Supp. 750, 753 (D. Mass. 1986), *aff'd*, 831 F.2d 1177 (1st Cir. 1987). In evaluating any given geographic area, the test is "whether the party's mark is sufficiently known there . . . to create a likelihood of confusion among consumers, should a second user enter the same territory." *Id.* Plaintiff contends that this Court should grant injunctive relief covering the United States, where its mark is federally-registered. BCG appears to contend that crafting an appropriate injunction would be difficult, if not impossible, given CPI's global operations, international consumer base, and the broad range of public policy issues CPI addresses in addition to education policy.

In determining the protectable area of plaintiff's mark, however, the focus is properly on the plaintiff and its mark rather than the defendant. *See id.* Regardless of CPI's international nature, the fact remains that plaintiff has a mark that is protected by federal law in the United States. Enforcement of plaintiff's mark here cannot be avoided simply because it would disrupt CPI's activities in other countries. Accordingly, the injunction will cover BCG's use of @publicimpact and #publicimpact, and any reasonably similar variation of those phrases, in the United States.

### III. Conclusion

For the foregoing reasons, plaintiff's motion for leave to file subsequently published evidence is GRANTED, and plaintiff's motion for a preliminary injunction is GRANTED in part and DENIED in part. Defendant Boston Consulting Group, Inc., is hereby preliminarily restrained and enjoined as follows:

1.      For the purposes of this Preliminary Injunction Order, the following definitions shall apply:

     a.      "Defendant" shall mean Boston Consulting Group, Inc.

     b.      The "Market" shall mean the United States of America.

2.      Defendant may not engage in the following activities:

     a.      Defendant shall not use or display "@4PublicImpact" as a username on Twitter, or any other social media, or for any other purpose in the Market;

     b.      Defendant shall not use or display "#publicimpact" as a hashtag on Twitter, or any other social media, or for any other purpose in the Market; and

     c.      Defendant shall not use or display the phrase "public impact," or the term "public impact" with two or fewer letters, numbers, or characters appended, as a username, hashtag, or otherwise in its social media, marketing, advertising, or other commercial activities in the Market to identify the source of its services or to promote those services; provided, however, that Defendant may do so as part of a longer term or phrase, such as, for example, "Centre for Public Impact" or "Centre for Public Impact:  A BCG Foundation."

3.      This Order is binding upon Defendant and its agents, servants, and employees, and upon all persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

4.      This Order shall take effect upon the posting of a bond as set forth below, and shall remain in effect until the conclusion of the trial of this matter; provided,

however, that it may be dissolved or modified upon appropriate motion and a

showing of good cause to this Court.

5.      Plaintiff shall post a bond in the amount of $25,000 as soon as reasonably

practicable after entry of this Order.

**So Ordered.**


                                        /s/  F. Dennis Saylor
                                        F. Dennis Saylor IV
Dated:  March 11, 2016                  United States District Judge